**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Dennis E. Carlen, trustee for the next of kin of Patricia Ann Carlen,

Plaintiff,

v.

Minnesota Comprehensive Epilepsy Program, P.A. d/b/a MINCEP Epilepsy Care, Ilo E. Leppik, M.D., and Robert E. Maxwell, M.D.,

Defendants.

Civ. No. 00-39 (RHK/JMM)
**MEMORANDUM OPINION AND ORDER**

---

Charles B. Harris, Doar, Drill & Skow, Baldwin, Wisconsin, for Plaintiff.

John Munger, Meagher & Geer, P.L.L.P., Minneapolis, Minnesota, for Defendants Minnesota Comprehensive Epilepsy Program PA and Ilo E. Leppik, M.D.

Jean B. Hoppe, Geraghty, O'Loughlin & Kenney, P.A., Saint Paul, Minnesota, for Defendant Robert E. Maxwell, M.D.

---

**Introduction**

Patricia Ann Carlen died on June 9, 1998, following years of treatment for a brain tumor. Ms. Carlen was treated by Robert E. Maxwell, M.D., a neurosurgeon at the University of Minnesota Hospitals, and Ilo E. Leppik, M.D., a neurologist and epileptologist with the Minnesota Comprehensive Epilepsy Program, P.A. ("MINCEP"). She was survived by her husband Dennis and two daughters. Dennis Carlen brought this



FILED APR 18 2001
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD APR 18 2001
DEPUTY CLERK

wrongful death action against several individuals and entities that provided medical care to Ms. Carlen, including Dr. Maxwell, Dr. Leppik, and MINCEP. Plaintiff's action arises out of allegations of medical malpractice.

Before the Court are two motions for summary judgment, one brought by Dr. Maxwell and the other brought by Dr. Leppik and MINCEP. For the reasons set forth below, the Court will grant their motions.

**Background**

On April 26, 1980, Patricia Ann Carlen was admitted to United Hospital in Saint Paul after having a seizure. (Hoppe Aff. Ex. C. (Medical records from United Hospital).) She underwent two CT scans -- one on April 26 and the other on May 23 -- which showed a lesion in the left frontal region of the brain. (Id.; see also Hoppe Aff. Ex. D (June 23, 1980 letter from Dr. Shelly Chou to Dr. Terry Domino).) The physicians at United Hospital prescribed anticonvulsants to control the seizures. (Hoppe Aff. Ex. C.)

On June 23, 1980, Ms. Carlen was admitted to the University of Minnesota Hospitals to see a neurosurgeon, Dr. Shelly Chou. (Hoppe Aff. Ex. D. (Admission report).) Dr. Chou examined Ms. Carlen and reached a diagnosis that included a slow growing brain tumor.[1] (Hoppe Aff. Ex. D.) Dr. Chou recommended "sit[ting] tight for

---

[1] Dr. Chou stated that her differential diagnosis "would include neoplasm, infiltrating glioma, grade I or grade II, infarction and possibly cerebritis," although Dr. Chou indicated that the last item was unlikely. (Hoppe Aff. Ex. D (June 23 letter from Dr. Chou to Dr. Domino).)

the time being" and repeating the CT scan in a few months to see if the lesion was "growing or changing in a way that is more suggestive of a tumor." (Id.) If a CT scan showed growth or change in the lesion, Dr. Chou favored a biopsy "to make a histological diagnosis, to be followed by appropriate therapy." (Id.) If the lesion did not grow, no biopsy would be necessary.

Beginning in 1987, Ms. Carlen began treating at the Mayo Clinic, seeing a neurologist and a neurosurgeon there. (Hoppe Aff. Ex. F (Medical Records from Mayo Clinic).) MRIs taken during the late 1980s and early 1990s showed no appreciable change in the tumor. (Id.) During this period, Ms. Carlen generally suffered two or three grand mal seizures each year.

On December 14, 1993, Ms. Carlen returned to the University Hospital to be seen by Defendant Dr. Robert Maxwell, a neurosurgeon. (Hoppe Aff. Ex. D. (Admission record).) Dr. Maxwell reviewed several MRI scans from 1989 through the present -- the January 1993 MRI scan indicated a four to six centimeter lesion in the left frontal lobe extending into the corpus callosum. (Id. (Dec. 14, 1993 letter from Dr. Maxwell to Dr. Gumnit at MINCEP).) In the progress notes for Ms. Carlen's visit, Dr. Maxwell recorded that he

> discussed risks, indications and alternatives of diagnostic procedures such as stereotactic or excisional biopsy. Patient is aware that lesion in frontal lobe is likely a brain tumor, but would prefer to forego any surgical procedure at this time. I will arrange appointment with MINCEP regarding seizure control and anticonvulsant therapy.

(Id. (1993 progress notes).) In his letter to Dr. Gumnit at MINCEP, Dr. Maxwell indicated that he concurred with previous assessments that the lesion was most likely a low-grade glioma. (Id. (Dec. 14, 1993 letter).) Dr. Maxwell further stated that

> [i]t was emphasized that this was only a clinical impression and that a definitive diagnosis would require a tissue biopsy for pathological review. A natural history of this entity was discussed in depth. We agree with the approach of watchful waiting and annual MRI scans. She is quite comfortable with this.

(Id.) Dr. Maxwell asked that MINCEP review Ms. Carlen's anticonvulsant schedule and make appropriate recommendations in hopes that her seizures might be better controlled. (Id.)

On December 27, 1993, Ms. Carlen began treating with Defendant Dr. Ilo E. Leppik at MINCEP. Instead of Ms. Carlen having annual MRI scans, it appears that she had scans every three years. The 1995 MRI showed no significant change. A January 9, 1998, MRI conducted at Abbott Northwestern Hospital, showed that the tumor had progressed since May 15, 1995. (Hoppe Aff. Ex. A (Medical Records of Abbott Northwestern).) Among the radiologist's conclusions was a notation stating "Question primary malignancy." (Id.)

On March 3, 1998, Ms. Carlen saw Dr. Maxwell. The progress notes state as follows:

> Though patient reticent to consider surgical options, chemical treatment or radiological treatment at this time in view of her benign course over many years, if enhanced scan shows definite evidence of malignant change or change

> in appearance – these options can be reconsidered.
>
> Mrs. Carlen agreed to follow-up scan with gad. [indecipherable] will call to set up an appt. to discuss results & options.

(Defs.' MINCEP and Leppik's Mem. Supp. Summ. J., Ex. C (University Hospital records, outpatient progress notes).) Following his visit with Ms. Carlen, Dr. Maxwell prepared a letter to Dr. Leppik at MINCEP. (Hoppe Aff. Ex. D (Mar. 3, 1998 letter from Maxwell to Leppik).) Dr. Maxwell informed Dr. Leppik that

> An MRI was performed in May of 1995 and a follow-up scan from January of 1998 demonstrates progression of hyperintensity on T2 imaging across the corpus callosum in the left frontal region. Unfortunately, this exam does not have gadolinium enhancement, so it is difficult for us to assess if there is possible a more aggressive component to the mass. At this time her examination is normal.
>
> It is our recommendation that she undergo an MRI with gadolinium enhancement. Because of the progression and the possibility of treating either with radiation or chemotherapy, we do recommend proceeding with a biopsy of the lesion at this time. We will try to arrange for an MRI to be performed and then discuss the results with you prior to proceeding with a biopsy.
>
> Thank you for referring her to us at this time. We will keep you posted as to the workup and following recommendations.

(Id. (Mar. 3, 1998 letter from Dr. Maxwell to Dr. Leppik).)

On March 4, 1998, Ms. Carlen made the following entry in her journal:

> I went to the doctor again and received news I didn't want to hear – this tumor in my head is growing again and I need to have another MRI that will hopefully tell us if it is a tumor and then whether I will need chemo or radiation trying to extend my living.
>
> This is something I have been dealing with for many years and I knew it wouldn't last forever . . . maybe I've been lucky – it's never easy always having something like this on your mind.

(Hoppe Aff. Ex. K (Patricia Carlen's journal).) Ms. Carlen underwent an enhanced MRI at Abbott Northwestern Hospital on March 17, 1998. (Hoppe Aff. Ex. A.) The radiologist who reviewed the scan reported that the lesion had progressed into the left frontal lobe since the MRI done in January. (Id.) The radiologist's differential diagnosis included "primary aggressive neoplasm such as glioblastoma multiform or high grade glioma." (Id.) The tumor was growing rapidly and was malignant.

The radiology report, prepared on March 19, 1998, identified Dr. Maxwell as the referring physician. It is unclear, however, whether Abbott Northwestern forwarded a copy of the radiology report to Dr. Maxwell. Dr. Maxwell has indicated that his office has no record of having received a report from Abbott Northwestern. Dr. Maxwell's office did not contact Ms. Carlen to schedule a follow-up visit to discuss the results of the enhanced MRI, nor did Ms. Carlen contact Dr. Maxwell's office after having the enhanced MRI done.[2]

On April 20, 1998, Ms. Carlen experienced another seizure and telephoned Dr. Leppik's office. (Hoppe Aff. Ex. H (MINCEP Medical Records).) There is no evidence to suggest that Dr. Leppik talked to Ms. Carlen on that occasion. It is unclear whether her next scheduled appointment was moved up from the end of June to early June as a result

[2] It also appears that Ms. Carlen did not tell her family she had undergone a second, enhanced MRI at Abbott Northwestern in March, and asked Abbott Northwestern to bill her for the enhanced MRI at her place of work rather than at her home. (See Hoppe Aff. Ex. A; id. Ex. E (Dep. of Dennis Carlen).)

of this telephone call. In any event, Ms. Carlen returned, with her husband, to see Dr. Leppik on June 3, 1998. (Id.) In his progress notes for the appointment, Dr. Leppik observed that Ms. Carlen was "somewhat passive today, and the husband did most of the talking." The assessment portion of the progress notes for the June 3 appointment states that Dr. Leppik spent time talking with the Carlens about sexuality and issues of personal interactions, and also spent "a lot of time reviewing [Ms. Carlen's] current situation with the tumor surgery and prognosis." (Hoppe Aff. Ex. H (Progress Notes).) Ms. Carlen's husband denies that Dr. Leppik discussed surgery with them. (Aff. of Dennis Carlen, ¶ 5.)

On June 6, 1998, Ms. Carlen went to the emergency room of a hospital in Hudson, Wisconsin, complaining of headache and vomiting. She went home again later that day, but returned to the emergency room in the early morning hours of June 7 because she had experienced two seizures. Later that morning, she had another seizure and her mental state became unresponsive, with dilated and non-responsive pupils. She was thereupon transferred to Abbott Northwestern Hospital. Doctors at Abbott Northwestern performed brain surgery on June 8 in an effort to "debulk" the tumor. Ms. Carlen did not recover from this surgery, and was declared brain dead on June 9.

## Analysis

### I. Standard of Decision

Summary judgment is proper only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c).

The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and the inferences which may be reasonably drawn from it, in the light most favorable to the nonmoving party -- in this case, the defendant, Trans World. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but rather must demonstrate the existence of specific facts that create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueuer, 47 F.3d 953, 957 (8th Cir. 1995).

The nonmovant, however, cannot avoid summary judgment in favor of the movant merely by pointing to some alleged factual dispute between the parties. Instead, any fact alleged to be in dispute must be "outcome determinative under prevailing law," that is, it must be material to an essential element of the specific theory of recovery at issue. See Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992). The court does not weigh facts or evaluate the credibility of affidavits and other evidence on a motion for summary judgment. See Liberty Lobby, 477 U.S. at 249.

## II. Wrongful Death Based Upon Medical Malpractice

Plaintiff alleges that "in providing healthcare to Patricia Ann Carlen, the defendants and their agents and employees were negligent, deviated from the applicable standard of care for healthcare professionals, and failed to use reasonable care." (Compl. ¶ 5.) Plaintiff claims that "as a direct result of the negligence of said defendants . . . Patricia Ann Carlen died on June 9, 1998." (Compl. ¶ 6.) Plaintiff further claims that "by reason of the wrongful death of Patricia Ann Carlen, her next of kin have suffered pecuniary loss, and loss of society and companionship, as well as loss of advice, comfort, and assistance." (Compl. ¶ 7.)

Minnesota's wrongful death statute provides in pertinent part as follows:

> When death is caused by the wrongful act or omission of any person or corporation, the trustee appointed as provided in subdivision 3 may maintain an action therefor if the decedent might have maintained an action, had the decedent lived, for an injury caused by the wrongful act or omission. . . . The recovery in the action is the amount the jury deems fair and just in reference to the pecuniary loss resulting from the death, and shall be for the exclusive benefit of the surviving spouse and next of kin, proportionate to the pecuniary loss severally suffered by the death. The court then determines the proportionate pecuniary loss of the persons entitled to the recovery and orders distribution accordingly. Funeral expenses and any demand for the support of the decedent allowed by the court having jurisdiction of the action, are first deducted and paid. Punitive damages may be awarded as provided in section 549.20.

Minn. Stat. § 573.02, subd. 1. To establish a cause of action for medical malpractice involving negligent care and treatment, the plaintiff must prove the following essential elements:

> (1) the standard of care in the medical community applicable to the particular defendant's conduct;
> (2) that the defendant departed from that standard of care; and
> (3) that the departure from the standard of care directly caused the plaintiff harm.

See Bigay v. Garvey, 575 N.W.2d 107, 111 n.4 (Minn. 1998) (citing Plutshack v. Univ. of Minn. Hosps., 316 N.W.2d 1, 5 (Minn. 1982)). Plaintiff asserts that Ms. Carlen's death on June 9, 1998, was caused by a "brain herniation" (i.e., the tumor's growth caused Ms. Carlen's brain to be pushed out of its normal support structures), and was preventable through surgical debulking, chemotherapy, or radiation therapy. Plaintiff argues that, because the defendants failed to pursue any of those treatment alternatives with Ms. Carlen, she died prematurely.[3]

---

[3] Along with the claim that the defendants negligently "failed to stay on top of" Ms. Carlen's case, Plaintiff also asserts a theory of liability based on negligent non-disclosure, also called "informed consent." The following are the essential elements for a negligent non-disclosure claim:

> (1) a duty on the part of the physician to know of a risk or alternative treatment plan,
> (2) a duty to disclose the risk or alternative program, which may be established by a showing that a reasonable person in what the physician knows or should have known to be the plaintiff's position would likely attach significance to that risk or alternative in deciding whether to consent to treatment;
> (3) breach of that duty;
> (4) causation (the undisclosed risk must materialize in harm); and
> (5) damages.

Russell v. Johnson, 608 N.W.2d 895, 898 (Minn. Ct. App. 2000) (quoting Reinhardt v. Colton, 337 N.W.2d 88, 96 (Minn. 1983)). Plaintiff focuses on the essential element concerning the duty to disclose, arguing that a reasonable person in Ms. Carlen's position would have attached significance to information about the current status of her tumor in

The Defendants' principal argument on summary judgment is that Plaintiff cannot establish a direct causal link between Dr. Maxwell and/or Dr. Leppik's conduct (assuming, arguendo, that they deviated from the standard of care applicable to their specialties) and Ms. Carlen's death.[4] Drs. Maxwell and Leppik contend that the "direct cause" of Ms. Carlen's death was the inoperable brain tumor. That argument mis-frames the issue. At common law in Minnesota, "direct cause" is synonymous with "proximate cause." See Sivertson v. Moorhead, 119 Minn. 467, 469, 138 N.W. 674, 675 (1912). Negligent conduct is the "direct cause" of harm to another if it is a substantial factor in

---

deciding how to approach treatment. The Court concludes that a negligent non-disclosure claim does not fit this case. "Physician liability is imposed by the rule [regarding negligent non-disclosure] only for failure to secure the patient's informed consent to treatment which results in harm which the patient would have avoided by declining treatment or by choosing alternative treatment." Madsen v. Park Nicollet Med. Ctr., 431 N.W.2d 855, 861 (Minn. 1988) (emphasis added). Although Ms. Carlen's diary entry suggests she was aware of possible treatment options in light of her changed condition, there is no evidence that she consented to any particular course of treatment. Thus, Plaintiff cannot establish that a risk associated with a course of treatment to which Ms. Carlen consented matured into harm. "[T]he informed consent/ nondisclosure doctrine does not involve negligence in the administration of treatment, in failure to treat, or in failure to properly diagnose." Madsen, 431 N.W.2d at 861. Plaintiff is asserting a negligent failure to treat Ms. Carlen's brain tumor.

[4] The defendants also contend there is no causal link at all between their conduct and Ms. Carlen's death because, since Ms. Carlen was going to die from the brain tumor in any event, the defendants at most could merely "delay death." Defendants argue that a "failure to delay death" is not actionable under the wrongful death statute. The Court disagrees. Ms. Carlen died on June 9, 1998. The causation issue, properly framed, is whether the acts or omissions of one or more of the Defendants was a substantial factor in bringing about Ms. Carlen's death on June 9, 1998. The Court will not read the wrongful death statute as narrowly as the Defendants urge.

bringing about the harm. See Flom v. Flom, 291 N.W.2d 914, 917 (Minn. 1980) ("Proximate cause exists if the negligent conduct was a substantial factor in bringing about the injury.") Therefore, the issue of causation is properly framed as whether the acts or omissions of Dr. Maxwell or Dr. Leppik (assuming those acts and/or omissions were negligent) were a substantial factor in bringing about Ms. Carlen's death on June 9, 1998.

Defendants rely on Silver v. Redleaf, 292 Minn. 463, 194 N.W.2d 271 (1972), to argue that there is no such direct causation. In Silver, the plaintiff brought a wrongful death action arising out of her spouse's death following two days of severe abdominal pain. The trial court directed a verdict for the defendant doctor on the grounds that Silver had failed to prove the doctor's causal negligence with competent medical testimony. The Minnesota Supreme Court affirmed, holding that there was an

> absence of any proof that Dr. Redleaf's action or inaction was the direct cause of decedent's death. Plaintiff had the burden to show that it was more probable that death resulted from some negligence for which defendant was responsible than from something for which he was not responsible.

Silver, 292 Minn. at 465, 194 N.W.2d at 273. Silver "offered no medical testimony in support of her claim that Dr. Redleaf was causally negligent." Id. at 464-65, 194 N.W.2d at 272.

In this case, Plaintiff has offered expert medical testimony from Doctor Anthony Hall -- a neurosurgeon -- to demonstrate that Dr. Maxwell and Dr. Leppik were causally

negligent. Dr. Maxwell has challenged the sufficiency of that evidence under two separate standards: (1) the standard for the admissibility of expert testimony stated in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co. Ltd v. Carmichael, 526 U.S. 137 (1999); and (2) the standard for medical opinions regarding malpractice in Minnesota Statues Section 145.682. The Court begins with the adequacy of Dr. Hall's expert testimony under Daubert.

Dr. Maxwell argues that Dr. Hall's expert opinion cannot satisfy the threshold requirements of relevance and reliability called for by Daubert and its progeny and by new Rule 702 of the Federal Rules of Evidence.[5] In exercising its "gatekeeping function" under Daubert, the district court ensures the relevance of the proposed expert testimony by determining whether the opinions offered are sufficiently tied to the facts of the case. See Daubert, 509 U.S. at 591. As for reliability, a district court may consider a number of nonexclusive factors, including "(1) whether the theory or technique can be

---

[5] Rule 702 of the Federal Rules of Evidence, which became effective on December 1, 2000 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

(and has been) tested, (2) whether the theory has been subjected to peer review and publication, (3) the known or potential rate of error, and (4) whether the theory has been generally accepted." Peitzmeier v. Hennessy Indus., Inc., 97 F.3d 293, 297 (8th Cir.1996) (quoting Daubert, 509 U.S. at 594). The Eighth Circuit has recently used these factors in evaluating the reliability and admissibility of a physician's opinion. Turner v. Iowa Fire Equip. Co., 229 F.3d 1202, 1208 (8th Cir. 2000) (evaluating treating physician's opinion on causation in personal injury lawsuit).

With respect to the relevance of Dr. Hall's testimony, Dr. Maxwell argues that the opinions regarding causation in Dr. Hall's expert affidavit dated June 26, 2000, are not sufficiently tied to the facts of this case. Dr. Hall opined on causation as follows:

> 10. That in your affiant's opinion, the negligence of Dr. Maxwell as outlined in the paragraphs above was a cause of the wrongful death of Patricia Carlen on June 9, 1998 since such negligence prevented Mrs. Carlen from being fully informed of the nature and extent of her problems, prevented her from being fully informed of her options for treatment, and prevented her from obtaining treatment prior to her death. Such treatment more probably than not would have reduced the pressure on her brain which the tumor was exerting. As a result of the failure to reduce such pressure her brain herniated and caused her death on June 9, 1998.
>
> 11. That in your affiant's opinion, the negligence of Dr. Leppik and [MINCEP] as outlined in the paragraphs above was a cause of the wrongful death of Patricia Carlen on June 9, 1998 since such negligence prevented Mrs. Carlen from being fully informed of the nature and extent of her problems, prevented her from being fully informed of her options for treatment, and prevented her from obtaining treatment prior to her death. Such treatment more probably than not would have reduced the pressure on her brain which the tumor was exerting. As a result of the failure to reduce such pressure her brain herniated and caused her death on June 9, 1998.

> 12. That Patricia Carlen would have lived until approximately January or February of 1999 but for the negligence of Dr. Maxwell, Dr. Leppik and [MINCEP] as described above.

(Hoppe Aff. Ex. B. ¶¶ 10-12 (Aff. of Dr. Anthony Hall).) Dr. Maxwell argues that there is no factual basis for Dr. Hall's opinion that Ms. Carlen would have lived until January of February of 1999 – seven or eight months beyond the date she actually died – had she undergone some unspecified treatment.

For purposes of evaluating the sufficiency of Dr. Hall's expert testimony, the Court assumes that Ms. Carlen's death on June 9, 1998, was due to a brain herniation caused by the growing tumor (as Plaintiff alleges), and that Ms. Carlen would have chosen to undergo <u>some</u> treatment in an effort to prolong her life.[6] Plaintiff asserts that Dr. Hall "has sufficient facts and data with which to conclude that, had Mrs. Carlen's tumor been treated, she would have lived an additional seven to eight months more, given the rate of growth exhibited on the MRI films." (Pl.'s Mem. Opp'n Defs.' Mots. for Summ. J. at 26.) Although Plaintiff argues that "surgical debulking, chemotherapy and radiation therapy" could have been used to slow the growth of the tumor (<u>id.</u>), that argument is too vague to be sufficiently relevant under <u>Daubert</u>. Dr. Hall has not opined with respect to <u>any specific treatment</u> that Ms. Carlen could have undergone, let alone

---

[6] Ms. Carlen's statement in her diary that she needed "to have another MRI that will hopefully tell us if it is a tumor and then whether I will need chemo or radiation trying to extend my living" can reasonably support an inference that Ms. Carlen would have taken chemotherapy or radiation treatment to attempt to prolong her life.

addressed the effectiveness of that treatment in slowing the growth of the tumor from which Ms. Carlen suffered.[7] Furthermore, although Dr. Hall acknowledges that there are potential complications and risks associated with various courses of treatment for glioblastoma multiform, there is no evidence before the Court that Dr. Hall considered those risks in making his causation analysis. (See Dep. of Dr. Anthony Hall at 49, 112 (attached to letter to Court from Jean B. Hoppe dated Apr. 3, 2001).) Therefore, Dr. Hall's opinion that Ms. Carlen died earlier than January or February of 1999 as a result of not receiving some unspecified course of treatment is not sufficiently tied to the facts and data of this case to be relevant.

As for the reliability of Dr. Hall's opinion on causation, the Court finds that Dr. Hall's affidavit does not satisfy the indicia set out in Daubert. There is no evidence that Dr. Hall's opinion on causation is "based upon a methodology that has been tested, subject to peer review, and generally accepted in the medical community." Turner, 229 F.3d at 1208. While the Eighth Circuit has held that a medical opinion regarding causation which is "based upon a proper differential diagnosis (one that systematically rules out other possible causes) satisfies Daubert," id., it appears that Dr. Hall used no such differential diagnosis here. In forming his opinion that but for the defendants'

---

[7] When Dr. Hall was asked at his deposition whether he could state with a reasonable degree of medical certainty how long Ms. Carlen would have lived if she had radiation therapy and a tumor resection, he answered: "No. You can only go by the statistical values and averages that are out there, with some range." (Harris Aff. dated Apr. 12, 2001, Ex. C at 66-67 (Dep. of Dr. Anthony Hall).)

failure to treat Ms. Carlen's tumor in March of 1998, she would have lived beyond June 9, 1998, Dr. Hall apparently reviewed several studies relating to the treatment of glioblastoma multiform tumors and arrived at a median life expectancy for a patient with such a tumor. Dr. Hall then applied that median life expectancy to the month in which Ms. Carlen had the enhanced MRI performed. (Harris Aff. dated Apr. 12, 2001, Ex. C. at 110-12.) There is no evidence before the Court regarding the known or potential rate of error for Dr. Hall's methodology of evaluating causation, or whether Dr. Hall's methodology has been generally accepted within the medical community. Accordingly, the Court cannot conclude that Dr. Hall's methodology is sufficiently reliable to be admissible.

Based on the foregoing, the Court concludes that Plaintiff's expert opinion regarding the causal link between the Defendants' actions or omissions and Ms. Carlen's death on June 9, 1998, does not meet the threshold requirements for admissibility under the Daubert line of cases. In light of this determination, the Court further concludes that Plaintiff has not come forward with sufficient admissible evidence regarding causation to permit that issue to be submitted to a jury. The Court, therefore, will grant summary judgment on Plaintiff's wrongful death Complaint in favor of Defendants.

## Conclusion

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED THAT**

1. Defendants Minnesota Comprehensive Epilepsy Program, P.A. and Ilo E. Leppik, M.D.'s Motion for Summary Judgment (Doc. No. 29) is **GRANTED**; and

2. Defendant Robert E. Maxwell's Motion for Summary Judgment (Doc. No. 25) is **GRANTED**; and

3. Plaintiff's Complaint is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Dated: April 18, 2001

RICHARD H. KYLE
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES: APR 18 2001

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*